## INDIAN McCALEB et al. v. GEORGE DOUGLASS et al.

The affirmative answer of a testator to the question whether this was his will, is not equivalent to the " presentation " of the will to the witnesses as required by the second paragraph of article 1574 of the Civil Code. Without such presentation, the will must be declared void and of no effect.

APPEAL from the District Court of the Parish of Tensas, *Farrar*, J. *Farrar, Snyder & Lewis*, and *A. N. Ogden*, for plaintiffs and appellants. *L. V. Reeves, H. B. Shaw, C. Roselius* and *T. W. Collens*, for defendants.

BUCHANAN, J. This is a suit by certain heirs at law of Archibald Douglass, deceased, to set aside the will of the said Archibald Douglass, purporting to be a nuncupative will, under private signature, upon the following grounds:

1. That said Douglass was not of sound mind, at the time when said pretended instrument purports to have been executed; and from insanity and mental imbecility at that date, was utterly incapacitated to make any testamentary disposition whatever.

2. That said pretended will is not signed by said Douglass, with his own proper signature and name.

3. That said pretended will was neither written by the testator himself nor from his dictation; nor did the said Douglass present the paper purporting to contain his will, to the witnesses, and declare the same to contain his last will.

It only becomes necessary to examine the third of these grounds.

The will in question is attested by six subscribing witnesses.   Of these four have given their evidence, on the trial of this cause.   We subjoin so much of their testimony, taken down by the Clerk on trial, as bears upon the ground of nullity under consideration:

Samuel W. Dorsey, sworn, says: He was acquainted with the late Archibald Douglass, deceased; became acquainted with him in 1841, and then up to the time of his death.   Mr. Archibald Douglass died in 1856. Witness being shown the will of A. Douglass, says:  On the day before Douglass died, I heard that he was very sick, and wanted to see me.   I went over to see him about three o'clock the same day.   The first person I saw was Mr. Bland, who told me he and Mr. Douglass were anxious for me to write the will of Mr. Douglass, and that he, Mr. Bland, also desired it.

He told me that I had heard of Mr. Douglass' intentions, and what they had previously been.   Mr. Bland said that he was very anxious that he should leave his property as he intended to do, and therefore wanted me to write his will.   Mr. Bland's remark to me, as well as I recollect, was, that he had raised those two boys, and took great interest in them.   I then went into the room where Mr. Douglass was lying in bed.   I asked him the question how he was; his reply was, that he was very sick, and was very anxious to make a will.   His chief object was to dispose of his property to his two nephews, James and George Douglass, and to provide for a negro woman, who had been very attentive to him whilst sick, and for some time.   Don't know that he mentioned how long, nor do I know how long.   I then asked him the question, what negro woman he meant.   His reply was, that she was the daughter of a Mr. Cammack, residing some six miles off.   He then asked me if he could make her a present of the sum of five or six thousand dollars, I do not recollect which.   My reply was, as far as I recollect, that I supposed she was the slave of Mr. Cammack, and a donation of that kind would not invest the proceeds of the draft in her.   His reply was, that she was either manumitted, or that she was about being sent out of the State to be manumitted.   That was about the amount of the conversation I had with Mr. Douglass.   He requested me at that time to write his will for him, and I was also asked by Mr. Bland and others to do so.   I replied that Mr. Douglass was at that time very nervous, and that if I did so, I would like to have some form book.   I wrote the will the next day.   I remarked to his friends, Mr. Bland and others, that I would return the next morning, and went in to see Mr. Douglass before I left, and promised him to return in the morning.   On the following morning I returned, between eight and nine o'clock.   I then had an interview with Mr. Douglass.   He was at that time much more calm and collected than on the previous evening, and expressed a great desire to have his will written.   He informed me that Mr. Bland had suggested to him that he should leave a certain number of small legacies to other members of the family, who would be gratified by the same.

After I had been standing by his bedside for some time, Mr. Bland came in, and the subject was then mentioned about some legatees who were in indigent circumstances, and that it would be a great favor to them to do so; to which Mr. Douglass assented.   He had mentioned the subject before to me, and after Mr. Bland came, it was repeated in his pres-

ence. I then procured some ink and some paper, and went to a room immediately opposite the room Mr. Douglass occupied, and wrote this will, on several times visiting Mr. Douglass, and asking him if I understood him aright as to how those legacies were to be made, and in reference to the freedom of some negroes. There was no one present in the room while I was writing the will, though persons would occasionally step in for a few moments, except on one occasion Mr. Bland stepped in and commenced reading the will, and made some suggestions to some parts of it, and I told him I was writing Mr. Douglass' will, and not at his, Mr. Bland's, dictation. His reply, as well as I recollect, was, his anxiety about James Douglass and George Douglass, the principal legatees. Mr. Barton, one of the subscribing witnesses to the will, was present in the room at the time Bland came in. I then took this will to Mr. Douglass' bedside, and told him I had written his will, and wanted him to be particular and see if it was according to his dictation and direction, in the presence of witnesses, and he mentioned to me that I had omitted the name of a woman named Keziah, and wanted her name inserted, and I filled the name in; then, at his suggestion, a blank having been left in the will for that purpose, I filled in the name in my own handwriting. After the will was read and approved of, sentence by sentence, by Mr. Douglass, he raised up in bed and signed his name to it. I read the will fully and audibly, so that all the witnesses could hear it, my object being to comply fully with the law. When I had read this will to Mr. Douglass, I told him I wanted him to be certain it was his *last* will and testament; and Mr. Douglass answered to my question, yes, after each sentence being read, and then answered yes to the last sentence. Myself and the other witnesses signed the will, in Mr. Douglass' presence. The signature to the will is the signature of Mr. Douglass. I saw him write it with his own hand. Mr. Bland did not dictate to me the terms of this will at the time I was writing it, nor did he dictate it to me at any other time. Whilst I was engaged in writing the will, I do not recollect ever asking Mr. Bland to go into Mr. Douglass' room and ask him about the clauses in it. I recollect distinctly that I did not ask Mr. Bland to do so. Mr. Bland did not pass back and forth from Mr. Douglass' room to give me any instructions about the will. Mr. Bland may have walked into the room while I was writing in the room, but I only recollect distinctly his coming into the room once, as before stated. I wrote the will in my *own language,* to express the wishes of the testator, as communicated to me by him, and not in the language of Mr. Bland. Mr. Bland remarked to me that morning, that Mr. Reeves was coming. I remarked to Mr. Bland that Mr. Douglass was in great anxiety to write the will. It was during the writing of the will that Mr. Reeves came; I do not recollect the precise time. I recognize the signature of each of the witnesses, signed by the witnesses in my presence, and that of the testator. All the witnesses were residents of the Parish of Tensas at that time. The place of the execution of the will was at the residence of Mr. Douglass, in this parish.

Mr. Douglass directed me to insert this provision in his will in relation to the legacy to Sally Wright. I endeavored in writing this will to express the wishes of the testator. The provisions were certainly communicated to me by Mr. Douglass.

42

*Cross-examined.*

The words were mine, and I used them to express the intention of the testator. He expressed to me the exact amounts he wished to leave to each one, as I asked him about them at that time.

Witness says he cannot recollect whether Mr. Douglass dictated the terms consecutively about the legacy to Sally Wright. The witness is asked by the counsel for plaintiffs. Witness being asked whether, before the will was read in presence of the witnesses, the testator had presented the paper to the witnesses, declaring that it contained his will, or whether, before the reading of the will, the testator had declared that the paper about to be read contained his last will, witness answers, "that he does not recollect that *either* was done."

In the questions asked by him of Mr. Douglass in the making of his will, there was no suggestion made by witness to Douglass about any testamentary disposition to any person. That his questions in relation to the testamentary dispositions were only made to ascertain more clearly the wishes of the testator, so that he could express them more definitely.

*Cross-examined.*

On witness' first interview with Mr. Douglass, the day before the will was written, does not recollect his saying any thing to him about any testamentary disposition to Mrs. Wright. The next day Douglass told him that Mr. Bland had suggested the propriety of making some particular legacies. Mr. Douglass told him that Mr. Bland had suggested the amounts, and Mr. Douglass said he had no objection. Witness does not recollect, in calling over the legacies, whether Mrs. Evans' or Mr. Prior's names were mentioned or not.

Witness was extremely anxious to carry out the wishes of the testator, and make a good and valid will; and witness' whole attention was directed to this object. Witness' impression is that he remained at Mr. Douglass' about an hour or an hour and a half after the will was made.

John V. Sevier, sworn by defendant. He is a resident of the Parish of Tensas. Was a resident in 1856; was acquainted with A. Douglass, deceased. Examined the last will marked (A), recognizes the signatures of the witnesses to it. Recognizes Mr. Douglass' signature thereto; he saw him sign it. Witness states that the will was read over to Mr. Douglass, in an audible voice, in the presence of the witnesses, before Mr. Douglass signed it. Mr. Douglass requested to be held up in bed, to sign the document. Mr. Douglass requested him to witness the will. After the will was written, and Mr. Dorsey had read it to Mr. Douglass, and asked him if it was his last will and testament, he said it was. It was in the presence of all the witnesses, and immediately after that, that Mr. Douglass signed the will. Witness signed the will, together with the other witnesses, in presence of each other, and in presence of Mr. Douglass.

L. L. B. Barton, sworn, says, he is a resident of the Parish of Tensas; was there during the year 1856. Being shown the document marked (A), says he recognizes his signature to it, also the signature of John V. Sevier, and saw Mr. Douglass sign the will. Says he would not recognize Mr. Douglass' signature ordinarily, but that he saw Mr. Douglass sign that will. The will was read over to other persons outside of Mr. Douglass' room; and witness is positive that it was read over to Mr. Douglass before he signed it.

*Question.* "Did or did not Mr. Douglass, in presence of the witness and the other subscribing witnesses, and before signing document (A), declare that it was his last will and testament; and if not, what did he say in relation to it? "

McCaleb
*v.*
Douglass.

Witness answers, he does not recollect the exact words of Mr. Douglass; but the purport of it was, that it was his last will. He had some corrections made in it before signing it.

This witness and the other subscribing witnesses signed this will, in the presence of Mr. Douglass, and in the presence of each other. Witness was in the room when Mr. Dorsey was writing the will; and while writing it, when Maxwell W. Bland came into the room, that Mr. Bland asked Mr. Dorsey if he had got to the describing of the property, and Mr. Dorsey told him to go away,—that he would read the will to him after it was done; that Mr. Bland did not, in the presence of witness, dictate any legacies to Mr. Dorsey, or any part of said will.

*Cross-examined.*

Witness says that Mr. Bland was in the room when Mr. Dorsey was writing the will, once or may be twice. Witness thinks Mr. Douglass declared that it was his will, but is not sure. Witness being asked, ·"whether he, Mr. Douglass, made a voluntary statement that it was his will," says that Mr. Douglass did so, only by signing it. The correction of interlining the name of Keziah was all the correction that witness saw made in the will.

*Examination by Plaintiff Resumed.*

Witness says—I think that Mr. Douglass did say, at the time of signing that will, that it was his will, or words to that effect.

H. C. Sevier, sworn on his *voir dire*, says: Witness is a brother-in-law of one of the defendants in this case. Witness says he does not know but ·what he does feel an interest in the result of this suit; witness is not directly or indirectly interested pecuniarily in the result of this suit, and the interest he feels in it would not prevent him from testifying the truth; that he would not be made richer or poorer by the result. Witness lived in the Parish of Tensas in December, 1856; witness being shown the document "A," recognizes his signature, and the signatures of the other witnesses. Saw Mr. Douglass sign the will in the presence of the witnesses whose names are to the will; witness and the other witnesses signed the will in the presence of Mr. Douglass, and in the presence of each other. The will was read over in an audible voice to Mr. Douglass, in the presence of the witnesses, before Mr. Douglass signed it; Mr. Douglass declared that the document was his will when Mr. Dorsey read it over to him. Mr. Dorsey asked Mr. Douglass if that was his will, and he answered, "Yes;" by which witness understood him to declare that it was his last will.

·As to the mode in which this will was prepared and written, there is the evidence of another witness in the record, who was not a subscribing witness of the will, but whose testimony is very important. This witness is the *Mr. Bland,* so often mentioned in the previous testimony. The following is his deposition, taken under a commission:

McCALEB
v.
DOUGLASS.

*Answers of M. W. Bland to Interrogatories and Cross-interrogatories.*

(The interrogatories and cross-interrogatories found on pages 85, 86 and
87 of the record. The answers on pages 89, 90, 91, 92, 93, 94, 95 and
96 of the record.)

*Answer to 1st interrogatory.* I know them all, and have known them for
the last fifteen or twenty years.

2d. I am the step-father of the defendants, James Stewart and George
Douglass and Mrs. Wright, and of course am connected with Mr. Prior
and Mrs. Evans, their uncle and aunt, and Mrs. Indian McCaleb, their
cousin.

3d. I knew him well and intimately.

4th. I knew him from the year 1838 till his death, a period of about
eighteen years, in Louisiana and Mississippi.

5th. I married his deceased brother's widow, Mrs. Emeline Douglass,
the mother of George and J. S. Douglass, the defendants.

6th. I have examined the document. I saw the original written, and
most of it is in my own language. The original was written by S. W.
Dorsey, Esq., of Tensas parish, at the house of Archibald Douglass, on
the 28th of December, 1856, and there is where I first saw it. It was in-
tended for the last will and testament of Archibald Douglass, who was ly-
ing very ill, in a dying condition, at his house, in a room near to which
the will was written. No one was present in the room where the will was
being written, except Mr. Dorsey and myself. While Mr. Dorsey was in
the act of commencing the will, he requested me to step into Douglass'
room and ask him something about the legacies, if he did not want to give
something to his other relatives. I did so, and named most of the other
relatives, and Douglass answered "well;" and when asked how much to
give them, he answered, "you say." With this answer, I returned to the
room where Dorsey was writing, and had the will written according to my
idea what Douglass ought to do. At no time, to my knowledge, did
Douglass dictate any portion of that will to Mr. Dorsey. That portion of
the will which gave Cornelia Cammack $5,000 was modified, at the sug-
gestion of Mr. Dorsey, with the condition that she should be manumitted
by her master, Y. Cammack. I suggested the legacy and its amount, and
Mr. Dorsey, being a lawyer, suggested the conditions of it. After the
will was written out, L. V. Reeves, Esq., arrived at the house, and came
into the room where Mr. Dorsey and I were. Mr. Dorsey then read the
will over to Mr. Reeves, and he, Reeves, said it was better for him to
write the will over again, as he was afraid it was not right, and might
give rise to trouble. But I told him it was then too late, as Douglass was
fast sinking, and I refused to let him write it over. Mr. Douglass' men-
tal and physical condition was very low, and the will had to be written
very rapidly. I hurried Dorsey several times, and told him to lose no
time. Mr. Dorsey acted as scribe, and wrote down the various legacies,
as I stated them, and frequently in my own words. I had had frequent
conversations with Douglass when in health previously, and had a tolera-
ble notion of what his views were as to the disposition of his property.
When I did not recollect them, I dictated the will in accordance with what
I thought was right and just. In relation to the legacies to Mrs. Wright,
Mrs. McCaleb, and the two young Evanses, I fixed them at about what

these two ladies owed, and enough to school the Evanses. I intended to place Mrs. Lucinda Evans in the will as a legatee, but was in such a hurry that I entirely overlooked her.

7th. I saw, as I said before, the will written. I have stated in the preceding answer the circumstances under which it was written. After it was written, Dorsey took it into Douglass' room, and the other witnesses being called, Douglass was propped up in bed, and either Dorsey or Reeves read the will over. Douglass seemed to pay as much attention to the reading as a man in his deplorable condition could do. There are conditions, however, attached to some of the legacies in the will, which Douglass, even in health, could not understand or appreciate, much less in his then condition. He appeared to assent to what was done and said in the will, as he had always been in the habit of doing in his business matters, which I had managed for the last ten or twelve years of his life. When the reading was finished, a pen was placed in his hand, when he scrawled upon the paper, "*A. Doglass,*" being unable to spell his own name correctly. After this act, Douglass went immediately into a deranged state of mind, which continued until his death. A few moments before Dorsey and I went out to make the will, the slaves Harry Truman, Wash, Columbus, Caroline and Keziah, or most of them, came into Douglass' room, and called his attention to a previous promise to emancipate them, when he said, "*I did,*" and made some remark to the effect that he would free them. When the will was read, Keziah's name had been left out, and she, having heard the reading, burst out weeping, when Douglass exclaimed, "*and Keziah!*" and her name was then inserted.

8th. I have already stated that Douglass did not dictate the will, but that I dictated nearly the whole of it, and Dorsey wrote it.

9th. I have already answered this in my previous answers.

10th. I believe I have stated all I know that I can now recollect distinctly about the writing and execution of the will.

The evidence of these witnesses does not accord in every particular; indeed, there are material contradictions between the testimony of Dorsey and that of Bland.

But it is evident from the testimony of each and every witness examined, that the will of Archibald Douglass was neither dictated, as prescribed in the first paragraph of Art. 1574 of the Civil Code, nor *presented by the testator to the witnesses,* as prescribed in paragraph second of the same article. It is impossible to say, from the evidence, how much of this testament is the expression of the intentions of the testator, and how much of those of Bland. The affirmative answer of the testator to the question whether this was his will is not equivalent to the "presentation" of the will by the testator to the witnesses required by the Code. The circumstances of the case resemble those of *Bardelabon* v. *Averett,* 11 An. 636. As in that case; the testator was dying when the will was read for the first time to him and to the witnesses simultaneously. The counsel of defendants rely upon the case of *Bouthemy* v. *Dreux,* 12 Martin 639. Without inquiring how far that case may now be considered as authority, we content ourselves with observing that the circumstances related at page 642 of the report, differ materially from the facts of the present case.

It is, therefore, adjudged and decreed, that the judgment of the Dis-

trict Court be reversed; that there be judgment for plaintiffs; that the nuncupative will under private signature of Archibald Douglass, dated 28th December 1856, be decreed to be null and of no effect; that the cause be remanded to the District Court for further proceedings in partition of the succession of said Douglass, as *ab intestato*, among his heirs at law; and that defendants and appellees pay costs in both courts.

VOORHIES, J., absent.